IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGE CORRAEL SNEED, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION No. H-14-0709 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this *pro se* section 2254 habeas case is respondent's motion for summary judgment. (Docket Entry No. 9.) Respondent filed the motion on June 11, 2014, and served a copy on petitioner at his address of record that same day. Despite expiration of a reasonable time in excess of 120 days, petitioner has failed to file a response to the motion, and the motion is uncontested.

Based on consideration of the motion, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this case for the reasons that follow.

## I. PROCEDURAL BACKGROUND

Petitioner was convicted of aggravated robbery with a deadly weapon and sentenced to seventy years incarceration on February 13, 2008. The conviction was affirmed on appeal on December 23, 2008. *Sneed v. State*, No. 14-08-00142-CR, slip op. (Tex. App.–Houston

[14th Dist.] 2008, pet. ref'd). The Texas Court of Criminal Appeals granted petitioner leave to file an out-of-time petition for discretionary review, and refused discretionary review on June 13, 2012. Petitioner's application for state habeas relief, filed with the trial court on July 10, 2013, was denied by the Texas Court of Criminal Appeals on January 8, 2014. *Ex parte Sneed*, WR-77,005-02, at cover.

Petitioner filed the instant federal habeas petition on March 16, 2014, raising the following claims:

1. He was denied his constitutional right to be present at trial.

2. Trial counsel was ineffective in

   (a) failing to request a continuance due to petitioner's absence; and

   (b) failing to subpoena a critical witness.

Respondent argues that these claims are without merit and should be denied.

## II. FACTUAL BACKGROUND

The intermediate state court of appeals affirmed petitioner's conviction pursuant to *Anders v. California*, 386 U.S. 738 (1967), and did not set forth a statement of facts in its opinion. In the motion for summary judgment, respondent adopts the statement of facts presented by petitioner in his appellant's brief on appeal, as follows:

> Suzanne Galtney, the complainant in the case, testified that on August 25, 2006, she was at home in the Memorial area of Harris County, Texas, along with her housekeeper Maria Rivera. It was a Friday and after lunchtime, complainant was in her bedroom packing for an upcoming trip when she heard a commotion downstairs. Then a masked man with a gun burst into her room pointing the gun at her and telling her that he wanted the cash with the sports

2

cards. She thought he was referring to a sports card collection one of her sons had. When she left her bedroom, she saw there were two other masked men in the house who were with Maria Rivera. She never saw any of the faces of the men.

Complainant led the man with the gun to the study where she got some coin collections and some foreign currency and gave those to the man. Then he told her to go downstairs. Complainant then told the man she would give them the money from her purse and walked towards the kitchen to get her purse. While she was doing this she saw a chance to get away and took it, bolting out of the house.

Complainant ran across the yard and flagged down a passing motorist who drove her away from the house and they called 911 to report the situation. They looked unsuccessfully for a nearby police officer and then drove back by the house where they saw the housekeeper standing outside. The housekeeper got in the car with them and this time as they drove away from the house they spotted two of the men who had been inside the house walking away from the house. Complainant recognized the two men from their clothing and build and so she told the 911 operator about the location of the men and the direction they were walking. Within two or three minutes after that, she saw the police apprehend the two men and a little later she and the housekeeper talked with the police about the incident. Complainant said that during the incident she was in fear for her life.

During cross examination, complainant explained that her husband has coached a basketball team and sponsored some AAU teams. One of her sons plays basketball and her husband has had team members meet at their home.

Kenneth Gardner, a landscape designer, testified that he was working in the yard of the house next door to complainant's home that day. Suddenly he heard a loud thud like someone hitting or going over the complainant's back fence. Then he heard the noise a second time and actually saw a man going over the fence. When he walked towards that area to get a better view, he saw two men going out the back of the neighbor['s] driveway. He never saw or heard a third man nor did he ever see any weapons. Shortly afterwards, he saw police cars and talked with the officers telling them what he had seen.

Thomas Tobias, an officer with the Memorial Village Police Department [MVPD] testified that he responded that day to a call in the neighborhood and

assisted in detaining two men who were on the side of the road. Then two witnesses were brought over to the location to identify the men and the men were transported to jail. Tobias transported a man named Villarreal and when he searched Villarreal, Tobias found a Swiss franc on him.

Detective Harold Walpole of [MVPD] testified that he responded to a robbery in progress call that day by going to the location where the suspects were last seen and taking them into custody. The two men were named Daniel Johnson and Andrew Villarreal. Walpole said that he gave them their legal warnings and that he recovered a backpack from one of the men. Inside the backpack, he found coins and currency, including foreign currency, and some collectibles, a pistol, mask, three cloth gloves and some clothing. Villarreal also said that the third suspect was driving a white Ford Taurus, was known as 'G', and had the last name 'Sneed.' Johnson also said the third man was called 'G' and drove a white vehicle. Walpole also assisted Villarreal in calling his apartment and after Villarreal made that call and talked to his wife or girlfriend, Villarreal said that 'G' was [at] his apartment. Walpole had Villarreal call the apartment again to see if 'G' was still there, but when he did, 'G' was no longer there.

William Dowden, an [MVPD] officer, testified that he too was dispatched to the robbery in progress that day. He along with Officer Brock went to the complainant's house and checked that location to see if any suspects were still there. They didn't find any suspects but did talk to the man working on the yard next door. They also looked for physical evidence and found a surgical glove lying [in] the grass near the driveway and also some coins in the driveway. Inside they saw the house had been ransacked. They photographed the scene and saw that some coins and foreign currency were strewn around the area of the staircase. Dowden said that the glove he found was bunched up as if someone had taken it off. He said he sealed the glove up in an evidence bag. Kyle Sission, also a MVPD officer, did the follow-up investigation. He testified that he interviewed at the station the two suspects they had apprehended separately. He noticed some discoloration on the surgical glove that was recovered and suspected that the discoloration came from the wearer's perspiration. Accordingly he decided to submit the glove to the Harris County Medical Examiner's Office (ME's Office) for DNA testing. He also acted as property custodian for the other physical items recovered. He went out to Villarreal's apartment complex where he tried unsuccessfully to locate the white Ford Taurus that had been described.

After yet another interview with Villarreal, Sission learned that G's full name was George Sneed and that he lived in the same complex as Villarreal. Sission then located a driver's license photo for a George Sneed that matched the description of the suspect and put that photo in a photo spread. He met with Villarreal's girlfriend Vanessa Flores on December 20, 2006 and she identified the photo as being the George Sneed that she knew. After that, he contacted the District Attorney's office and got a warrant issued for [Sneed].

Mark Powell, a DNA analyst for the Harris County ME's Office, testified that he compared swabs from the latex glove submitted in this case with a buccal swab taken from [Sneed]. Powell said he swabbed the outside of the glove and there wasn't enough DNA there to draw an[y] conclusions. He also swabbed the inside of the glove and found that it bore a mixture of DNA from at least two people. The major DNA contributor in that swab matched [Sneed's] DNA profile. Powell explained that where the DNA is mixed, he cannot tell in what order the DNA was deposited on the inside of the glove. He also explained that the amount of DNA that a person deposits varies depending on several factors including how often the person washes their hands and how much or little the person sweats.

Maria Rivera, complainant's housekeeper, testified that while she was folding clothes that day she heard voices and then saw two men with their faces covered holding complainant by the arms and taking her to the study. Rivera said that a third man [was at] the base of the stairs and was watching her. Then the two men came downstairs with complainant and when they let go of complainant's arm, complainant ran out the door. Rivera said the men then ran out a different door after complainant ran away. After the others ran out, Rivera ran outside and saw complainant in a car with another woman and Rivera joined them in the car. Later on they saw two of the men were in police custody.

Daniel Johnson testified that he was presently in jail charged with aggravated robbery out of this incident. He said there were four people involved: Andrew Villarreal, [Sneed], Jeremy Govan, and Johnson himself. Johnson said he attended high school with Govan and Villarreal at one point and then after graduation they met up again and began hanging out together. Johnson said he met [Sneed] over at Villarreal's apartment a few days before the incident. At the time of the incident, he only knew [Sneed] by the nickname of 'G'; later on [he] learned [Sneed's] full name. According to Johnson, [Sneed] frequently complained about his financial problems. Johnson said the subject of them

committing an aggravated robbery came up because [Sneed] said he needed money the day before the incident. Johnson said that he stayed overnight at Villarreal's apartment that night and was awakened by [Sneed] knocking on the door in the morning. [Sneed] said to get Villarreal up so they could go. Johnson knew they were going out to commit a robbery.

According to Johnson, they left the apartment complex with Govan driving his car. They went to a pizza parlor and then over to the Memorial area at [Sneed's] direction. They went to complainant's house and three of them went in while Govan stayed in the car. [Sneed] and Villarreal had guns with them, a chrome revolver and a black semi automatic respectively.

Johnson said that the housekeeper was the first person they saw when they went in the house. Villarreal spoke to her while [Sneed] and Johnson went upstairs where they found the homeowner. He said [Sneed] told the woman they wanted to know where the money was under some baseball cards in a box. [Sneed] took the homeowner to the study while Johnson stayed upstairs searching room to room. After a while, Johnson came downstairs and saw the homeowner suddenly run out the door.

After she ran, Johnson and his two friends ran out through the backyard. Johnson and [Sneed] (*sic*) jumped the back fence and while Johnson was helping Villarreal over the fence, [Sneed] ran off and Johnson said he didn't see [Sneed] again that day. Johnson said he also didn't see Govan again once they had entered complainant's house and hasn't seen him since then. Johnson said he and Villarreal were picked up by police a few blocks away. He said he wore a pair of brown gloves that day and [Sneed] wore surgical gloves. No one else wore gloves. He said he didn't initially tell the police the truth about the incident. He said he told the police the car they were using was a white Taurus when in fact Govan's car was a light green Taurus. He admitted that only within the last week ha[d] he said that Govan was involved.

Vanessa Flores testified that at the time of the incident she was living with Villarreal as his girlfriend. She knew [Sneed] because [Sneed] used to work as a cook at the same Popeye's restaurant as she did. Flores said that the cooks at Popeye's wear clear latex gloves while they work.

Flores said that Villarreal and [Sneed] hung out together. She also knows Govan as a friend of Villarreal's. On the day of the incident, [Sneed] came by in the afternoon and gave her Villarreal's car keys and cell phone and told her

he thought Villarreal was locked up. He said they had robbed somebody's house in Memorial that morning. He also said he had a gun that he had pointed at a lady and Villarreal had someone else in a choke hold. According to Flores, [Sneed] told her he and his friends split up after the lady of the house ran off and that Villarreal called saying he was in jail. Flores said that she told Villarreal that [Sneed] was there and Villarreal told her to tell [Sneed] to leave the apartment. [Sneed] left then and shortly afterwards, Villarreal called again saying the police wanted to talk to [Sneed].

Flores acknowledged that she didn't mention Govan to the police when they took her statement. She said that the statement she gave police was based on what [Sneed] told her but she didn't mention Govan.

Andrew Villarreal testified that in the summer of 2006, he was hanging out with Daniel Johnson and with [Sneed]. He said they started talking about robbing somebody. According to Villarreal, it was [Sneed] who brought up the subject because he couldn't pay his rent and Villarreal went along with it because he had recently lost his job.

Villarreal said that on the day of the incident, [Sneed] woke him and Johnson up talking about doing a robbery. First they drove around for a while. Govan was driving and they ended up at a house in Memorial and [Sneed] told them to follow him. Three of them went inside. Govan stayed in the car and drove off. Govan was supposed to come back and get them. [Sneed] and Govan had cell phones with them; Johnson and Villarreal did not.

[Sneed] and Villarreal each had a gun and all of them wore bandannas over their faces during the incident. According to Villarreal, [Sneed] had loaded both guns the night before. Villarreal said that he stayed downstairs with the maid while his friends went upstairs. They ended up running away from the house after one of the women got away, and he lost sight of [Sneed]. He said that he didn't see Govan again that day. [Sneed] (*sic*) and Johnson were caught nearby.

Villarreal testified that he didn't tell the police the whole truth at first. He didn't tell the police about Govan's involvement because he was trying to protect his old friend. He said he didn't tell the police or the prosecutor about Govan until a week before trial. He said he wasn't wearing gloves that day but Johnson and Sneed were. Villarreal recalled that [Sneed] had mentioned

playing basketball sometimes with kids from the Memorial neighborhood and had said that he would get them drunk and rob them.

The state introduced court records showing [Sneed] had forfeited his bond in this case by failing to appear as required.

After hearing the charge to the jury and argument of counsel, the jury found [Sneed] guilty as charged of aggravated robbery.

*Sneed v. State*, Appellant's Brief, pp. 2–11 (record citations omitted).

## III.  THE APPLICABLE LEGAL STANDARDS

A.    Habeas Review

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal

8

principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal.

*Id.* (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

B.  Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV. PRESENCE AT TRIAL

Petitioner claims that he was denied his constitutional right to be present at trial when the trial court convened the second day of trial in his absence. Petitioner claims that he was incarcerated and/or stranded in Dallas the second morning of trial and did not voluntarily waive his right to appear at his trial in Houston.

In his affidavit submitted to the trial court on state habeas review, trial counsel testified as follows:

> Below are the specific questions posed to me [in the trial court's] Order and my responses thereto.

> 1. State whether counsel knows that the Applicant was aware that he was required to return to court on February 12, 2008 for the continuation of his trial. State the basis for counsel's belief or knowledge.

>    Response: I am certain Applicant knew he was required to return to court on February 12, 2008 at 9:30 a.m.

>    First of all, at the conclusion of Voir Dire and in my and Applicant's presence, the Trial Court made it abundantly clear that trial would resume the next morning at 9:30 a.m.

>    Secondly, after recess for the day on Monday, February 11, 2008, I conferred with Applicant out in the hallway for at least 30 minutes. His girlfriend Shabre Vaughn was present during this conference.

>    At some point I gave Applicant my usual admonition about the lengthy line that forms behind the metal detectors and the elevators of the Courthouse Lobby and to not be late getting upstairs. For most of my representation, Applicant had been in custody and I did not want him to jeopardize his recently acquired bond.

Thirdly, this hallway conference was memorable in that ADA Spence Graham came out at one point and offered Applicant '20 agg.' This was remarkable because, (a) for a year, all I had even seen or heard was '35 agg,' and (b) we had just spent all day picking a jury. Mr. Graham explained that his Complainant was extremely reluctant to testify.

Upon Applicant's rejection of this reduced offer, I am sure my words to him were something like, 'OK, see you in the morning.'

2.   State whether counsel communicated with the Applicant on February 12, 2008 with regard to his whereabouts and why he was not present for the first day of testimony. State the content of such communication.

Response: On February 12, 2008, sometime after 9:00 a.m., Applicant called me on my cell phone. To my surprise, he indicated that he 'was in Dallas' and wanted to 'turn himself in.'

With ADA Graham's offer still fresh in my mind, I asked Applicant, 'Are you saying you'll sign for the 20? Do you want me to see if it's still on the table?

Applicant would not give me an answer. I am sure I then urged him to get down to Houston as soon as possible.

This was not a lengthy call as it was not going anywhere and I had opening statements bearing down on me. This phone call was the last communication I ever had with Applicant.

3.   State whether the Applicant on either February 11, 2008 or February 12, 2008 indicated to counsel that he was 'stranded' in Dallas and could not afford to come back to Houston for his trial. If the applicant made such statement, state whether counsel advised the court of the applicant's claim.

Response: At no time did Applicant indicate to me that he had any travel issues or financial hardships or that he was 'stranded' in Dallas or anywhere.

After hanging up, I immediately informed the Trial Court that Applicant, (a) claimed to be in Dallas, and (b) wished to 'turn himself in.'

4.  State what information counsel had at the time of trial that Applicant did not voluntarily absent himself from his trial.

    Response: All information that I had at that time – approximately 9:30 a.m., February 12, 2008, shortly before trial was to resume – was that Applicant had voluntarily absented himself – against my directives and those of the Trial Court.

5.  State whether counsel informed the Applicant that he should return to Dallas after the jury was selected and sworn on February 11, 2008, when the trial court informed the parties that the trial was to commence at 09:30 a.m. on February 12, 2008.

    Response: I never informed or suggested or recommended that Applicant return to Dallas after the jury was selected and sworn.

    During the jury trial, I did not know where Applicant was staying, but it was my understanding that he did have temporary accommodations in the Houston area.

    It was my understanding that his mother lived in Dallas and that Applicant also lived up there at some point. However, I never advised Applicant to 'go home' or travel back to Dallas. In my view, that would be preposterous on its face. A five-hour drive North, maybe two hours of sleep, and then a five-hour drive back South to Houston? I would never have advised such a commute.

6.  State why counsel failed to request a continuance in the Applicant's case when he failed to show up for the continuation of his trial.

    Response: I felt such a request would be fruitless and without merit; that I had no good faith basis for such a motion.

    If Applicant had told me in a concrete manner that he wanted to accept the current plea offer and/or that he was standing outside the Dallas County Jail getting ready to walk in and surrender himself and if he had

specifically asked me, '[Trial counsel], would you get Judge Keel to delay things until I get down there?' I would have filed a motion to continue.

But I did not get that. I did not know for sure where Applicant was. I did not know for sure what his intentions were.

7. State why counsel failed to introduce evidence of the applicant's incarceration in the Dallas County Jail.

Response: The short answer is that I simply did not know he was incarcerated in the Dallas County Jail.

Tuesday and Wednesday presented a fairly novel situation for me sitting alone at counsel table and I recall a lot of chatter – from bailiffs, DAs, possibly the Judge, possibly other court personnel – through the trial's conclusion concerning whether Applicant had been apprehended or not and/or where he was.

At no time – during or after trial – did I receive formal notice that he had been apprehended. My pay voucher reflects that I swore to and submitted it on Friday, February 15, two days after the trial had concluded. I believe it was then that someone in the court told me about Applicant's apprehension. Still later, I heard that Applicant had been brought back to Harris County; that he had been brought to court and sentence pronounced.

Applicant's mother called me at some point *after* the trial had concluded. She wished to know what had transpired. I relayed the verdict, that Applicant's two co-defendants had testified against him, and that an appellate attorney would most likely be appointed. She may have told me then that Applicant was in custody in Dallas; I am not certain of this.

Finally, on August 6, 2013, while preparing this affidavit, I learned for the very first time the details, *i.e.*, the 'when' and 'where' of Applicant's apprehension. The exhibits attached to Applicant's Memorandum in Support of Writ of Habeas Corpus indicate that Applicant was apparently pulled over in the 15000 block of the LBJ Freeway in Dallas at 4:00 p.m., February 12, 2008, and subsequently

booked into Dallas County Jail at 5:48 p.m. that day. This was all news to me.

*Ex parte Sneed*, pp. 67–70 (original emphasis).

In rejecting petitioner's habeas claim that he was denied his right to be present at trial, the state trial court made the following narrative findings of fact and conclusions of law on collateral review:

> Applicant claims that he was denied the right to be present at his trial because (i) he went to Dallas after voir dire on advice of counsel; (ii) once there, he realized that he did not have the means to return to Harris County; (iii) he then turned himself in to the Dallas County jail. The evidence supports none of these claims.
>
> Did [trial counsel] advise applicant to go to Dallas? No. [Trial counsel's] testimony that he did not so advise applicant is credible. Applicant's claim to the contrary is supported by no evidence.
>
> Was applicant stranded in Dallas? Applicant asserts this but does not prove it.
>
> Did applicant turn himself in at the Dallas County jail? The booking document he references shows that he was arrested at 4 p.m. by 'Dallas P.D.' at 15330 LBJ Freeway and booked into the Dallas County jail at 5:48 p.m. It does not say he turned himself in. It does not say that a Dallas County Jail facility employing 'Dallas P.D.' officers is located at 15330 LBJ Freeway. It does, however, disprove applicant's claim that he was already in custody in Dallas on Tuesday morning.
>
> Applicant was in the [trial courtroom] on February 11. He knew he had to be back on February 12 at 9:30 a.m. Instead, he went to Dallas. Therefore, he waived his right to be present at his trial.

*Id.*, pp. 130–31 (footnotes omitted). The Texas Court of Criminal Appeals relied on these narrative findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

15

It is a well-settled principle of constitutional law that a criminal defendant has a right to be present during his trial. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). As with most constitutional protections, the right to be present during trial can be waived by the defendant. What suffices for waiver depends on the nature of the right at issue. Whether a defendant must participate personally in the waiver, whether certain procedures are required for waiver, and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. *New York v. Hill*, 528 U.S. 110, 114 (2000); *United States v. Gonzalez*, 483 F.3d 390, 394 (5th Cir. 2007). Waiver of the constitutional right to be present at trial must be particularly informed or voluntary. *United States v. Alikpo*, 944 F.2d 206, 208 (5th Cir. 1991).

The state trial court in the instant case expressly found that petitioner waived his right to be present at his trial. Inherent in the trial court's findings and analysis is the finding that petitioner *voluntarily* waived his right to be present at trial, based on the facts that trial counsel did not advise petitioner to go to Dallas after trial on February 11, 2008; that petitioner did not establish that he was stranded in Dallas on February 12, 2008; and that petitioner was not in custody of police authorities in Dallas the morning of February 12, 2008, and had not "turned himself in" to Dallas authorities for transportation back to Houston. To the contrary, the record shows that it was petitioner's sole decision to leave Houston and travel to Dallas following trial on February 11, 2008, in full awareness that he was to appear in court for trial in Houston early the following morning. Petitioner's

16

conclusory allegation that he was "stranded" in Dallas February 12, 2008, and unable to return to Houston is unsupported in the record, and affords him no basis for habeas relief. Moreover, the record shows that petitioner was not detained and arrested by Dallas authorities until late afternoon, February 12, 2008.

Petitioner fails to establish a violation of his constitutional right to be present at trial. The state court denied relief on this claim. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## V.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment – that is, no actual prejudice is shown. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

Petitioner complains that trial counsel was ineffective in the following two particulars.

A.  Failure to Request Continuance

Petitioner claims that trial counsel was ineffective in failing to move for a continuance by on February 12, 2008, after petitioner informed him by telephone that he was stranded in Dallas and/or in police custody in Dallas.

In his affidavit submitted to the trial court on state habeas review, trial counsel testified as follows:

> 6.  State why counsel failed to request a continuance in the Applicant's case when he failed to show up for the continuation of his trial.
>
> Response: I felt such a request would be fruitless and without merit; that I had no good faith basis for such a motion.
>
> If Applicant had told me in a concrete manner that he wanted to accept the current plea offer and/or that he was standing outside the Dallas County Jail getting ready to walk in and surrender himself and if he had specifically asked me, '[Trial counsel], would you get Judge Keel to delay things until I get down there?' I would have filed a motion to continue.
>
> But I did not get that.  I did not know for sure where Applicant was.  I did not know for sure what his intentions were.

*Ex parte Sneed*, p. 64.

In rejecting petitioner's habeas claim that trial counsel was ineffective in not seeking a continuance, the state trial court made the following narrative findings of fact and conclusions of law on collateral review:

> Applicant claims that [trial counsel] was ineffective for (a) failing to seek a continuance when applicant failed to appear in court on February 12, and (b) failing to subpoena an alibi witness, Gwennetta Vann.  As a backdrop to

19

addressing these claims, this Court notes that [trial counsel] is an experienced and skilled attorney of integrity.

[Trial counsel] had no good faith basis to move for continuance. *If he had made the motion, this Court would have denied it.*

*Ex parte Sneed*, pp. 130–31 (emphasis added). The Texas Court of Criminal Appeals relied on the trial court's narrative findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

To prevail on his claim, petitioner must establish that it would have constituted reversible error for the trial court to deny a motion for continuance had one been made by trial counsel. This, he fails to do. The trial court clearly found that it would not have granted a continuance had trial counsel requested one on February 12, 2008. The trial court further agreed with trial counsel that counsel had no good faith basis to move for a continuance. Petitioner cites no authority showing that the denial of a continuance under these circumstances would have constituted reversible error. Thus, the record establishes neither deficient performance nor actual prejudice under *Strickland*. Petitioner's conclusory allegations are unsupported in the record and afford him no basis for habeas relief.

The state court denied relief on petitioner's claims of ineffective assistance. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

B.    Failure to Subpoena Critical Witness

Petitioner next claims that trial counsel was ineffective in failing to subpoena a critical defense witness, Gwennetta Vann.  Petitioner asserts that Vann would have established petitioner's alibi that he was at a funeral in Dallas at the time of the offense and could not have been a participant in the aggravated robbery in Houston.

In responding to this claim raised by petitioner on collateral review, trial counsel testified in his court-ordered affidavit as follows:

8.    State whether counsel was aware of a witness named Gwennetta Vann. If counsel was aware of Ms. Vann, state counsel's reasons for not calling Ms. Vann as a witness in the applicant's case.

Response: I was aware of Gwennetta Vann as a potential alibi witness.

Applicant claimed to have attended the funeral of Ms. Vann's brother in the Dallas area at a time that would have foreclosed Applicant's presence and participation in the underlying aggravated robbery in Houston.

After several phone calls and several drafts of an affidavit, Ms. Vann, a Dallas resident, declined to return a notarized affidavit.  I placed her in the 'reluctant witness' category.

At some point prior to trial, I discussed Ms. Vann with Applicant.  I explained we had the right to subpoena her to Houston to testify.  I explained to Applicant that calling her could be risky for two reasons: First, all the alleged alibi witnesses previously provided by Applicant had expressly cratered and could not support his alibi defense.

Telly Dunbar (Applicant's sister): 'I did not attend the funeral.'

Shabre Vaughn (Applicant's girlfriend): 'I did not attend the funeral.'

Cornelius Moore (Applicant's friend): 'I did not attend the funeral.'

Anthony Brooks (Cousin of Cornelius Moore): 'I did attend the funeral and I don't recall seeing Applicant.'

(The above is from the report of John Castillo, my appointed Independent Investigator, which I have attached as Exhibit 1.)

So, in my view, the alibi defense was immediately suspect. If Ms. Vann testified and the jury did not buy it, Applicant would pay dearly for it in additional pen time.

Secondly, I was aware from her file that the State had contacted the Rev. Fred D. Haynes, III, the pastor who presided at the funeral. I feared the State would fly him in on rebuttal. While not entirely dispositive, I feared the guestbook might show up in court *without* Applicant's signature in it.

Following this discussion, Applicant agreed not to subpoena Ms. Vann.

*Ex parte Sneed*, pp. 70–71 (original emphasis).

In rejecting petitioner's habeas claim that trial counsel was ineffective in failing to subpoena Gwennetta Vann for trial, the state trial court made the following narrative findings of fact and conclusions of law on collateral review:

Applicant claims that [trial counsel] was ineffective for (a) failing to seek a continuance when applicant failed to appear in court on February 12, and (b) failing to subpoena an alibi witness, Gwennetta Vann. As a backdrop to addressing these claims, this Court notes that [trial counsel] is an experienced and skilled attorney of integrity.

\* \* \* \*

Applicant also claims that [trial counsel] was ineffective for failing to subpoena Gwennetta Vann to testify that applicant was at funeral in Dallas on the day of the aggravated robbery. [Trial counsel] did not fail to subpoena the witness; he strategically decided not to do so. Why? In spite of multiple phone conversations about her testimony and several drafts of an affidavit to memorialize it, Ms. Vann failed to return the affidavit to [trial counsel]. Other

22

potential alibi witnesses had not panned out, telling [trial counsel's] investigator either that they were not at the funeral in question or that they did not see applicant there. Moreover, [trial counsel] knew that the prosecution had been in touch with the pastor who presided at the funeral and feared that the State would have him testify in rebuttal to Ms. Vann that applicant had not attended the funeral, perhaps corroborating his testimony with a guestbook that did not bear applicant's signature. Weighing the risk that Ms. Vann would make a reluctant and perhaps weak alibi witness potentially contradicted by a witness with moral authority and corroboration, [trial counsel] decided not to subpoena her. That decision was objectively reasonable and will not support a claim of ineffective assistance of counsel.

*Id.*, pp. 130–32. The Texas Court of Criminal Appeals relied on the trial court's narrative findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

As an initial consideration, complaints of uncalled witnesses are not favored in federal habeas corpus review and are approached with great caution, because allegations of what a witness would have testified are largely speculative. *Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001). Unless a petitioner specifically identifies the alleged witnesses, offers proof that they were available and willing to testify at the time of trial, and sets out the contents of their proposed testimony, the claim is not cognizable on federal habeas review. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Moreover, where the only evidence of a missing witness's testimony is from the defendant, claims of ineffective assistance of counsel are viewed with even greater caution. *Sayre*, 238 F.3d at 636.

Petitioner in the instant case alleges that Vann would have testified that he was at a funeral in Dallas at the time of the aggravated robbery in Houston. Petitioner's conclusory allegation of Vann's anticipated testimony is unsupported in the record. Petitioner, through

counsel or on his own, has been attempting since 2007 to produce Vann's alibi testimony; to-date, some seven year later, he still has not produced the alleged alibi testimony. Further, the trial court found that it was reasonable trial strategy under the circumstances for trial counsel not to subpoena Vann as a defense witness, given the risks inherent in her untested testimony. Petitioner fails to rebut the strong presumption, as well as the trial court's affirmative finding, that trial counsel's decision not to subpoena Vann had been reasonable trial strategy. Petitioner establishes neither deficient performance nor actual prejudice under *Strickland*.

The state court denied relief on petitioner's claims of ineffective assistance. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## VI. CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 9) is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**. A certificate of appealability is **DENIED**. Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the 3rd day of *November*, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

24